***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and that the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. On 5 December 2000, the date of the injury, this cause was subject to the North Carolina Workers' Compensation Act.
4. On said date, an employment relationship existed between the employee and employer, Transit Services, Inc.
5. The employer is insured by Hartford Insurance Company.
6. Plaintiff's alleged injury, which is the subject of this cause, is bilateral carpal tunnel syndrome.
7. Plaintiff's average weekly wage at the time of injury is subject to a Form 22 verification to determine amount of overtime paid.
8. Plaintiff is seeking compensation for temporary total disability and medical compensation.
9. The parties stipulated into evidence as Stipulated Exhibit #1, the Pre-trial Agreement as modified and initialed by the parties subsequent to the hearing, and a letter dated 22 April 2003, which stipulated that Plaintiff's average weekly wage was $295.93 and her compensation rate was $197.39. This letter was made a part of Stipulated Exhibit #1 and a part of this record.
 ***********
Based on the foregoing stipulations and the evidence the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, Plaintiff was 42 years of age. She is left-handed with a tenth grade education and no other vocational training. Plaintiff previously worked part-time as a cashier at Hardee's and as a packer at American and Efird. Before working for defendant-employer, Plaintiff was in good health, although she had previously broken her right index finger and suffered from bladder infections, sinus infections and a crooked spine.
2. Plaintiff began working for defendant-employer in 1998 as a tear-down laborer, where she disassembled recorder transformers for recycling. There are five stations on the disassembly line and Plaintiff has worked at each station. At the first station, Plaintiff received a pallet with 15 boxes. Each box contained 115 to 125 transformers. Plaintiff used a jack lift to transport the boxes to her workstation. She then used a knife cutter to cut the boxes open. At the second station, Plaintiff scraped the glue off the transformers to remove the cardboard that was attached to them. At the third station, Plaintiff used a five-pound heat gun to remove the end panels on the transformers, which each weighed approximately two pounds. Plaintiff was required to grip the heat gun and move it back and forth quickly. At the fourth station, Plaintiff opened the transformers with a tool called a smasher. At the fifth station, Plaintiff checked over and cleaned the transformers with a cleaning solution so that the units could be used again. Plaintiff testified that she worked on over 1800 transformers per day.
3. Plaintiff further testified that she worked at a fast pace and used her hands, arms and wrists at all of the stations. Plaintiff always used both of her hands, particularly when she cut open the boxes, held and pried off the end panels, gripped the heat gun, opened the units, took out the batteries and scrubbed the units with a rag or sponge. Most of the time, Plaintiff worked at the third station. She testified that she spent one minute or one second on each transformer.
4. In November 2000, Plaintiff noticed a throbbing ache in her arms from the elbow to the wrist. Plaintiff testified that she told her supervisor, Ratha Needham that her hands hurt. Ms. Needham did not send Plaintiff to a doctor. Because the pain in her arms was persistent, Plaintiff went to see her family physician, Dr. Emerson, who took her out of work. After Plaintiff gave the out of work note to her supervisor, she was assigned to work in the freezer, where the transformers were stored at the beginning of the day. Plaintiff's hands and arms continued to hurt. Dr. Emerson referred Plaintiff to Dr. Richard Avioli, an orthopedic surgeon.
5. On 23 April 2001, Plaintiff complained to Dr. Avioli of bilateral arm pain and described her pain as throbbing and sharp, radiating from her elbows dorsally along her forearms to the back of her hands. Plaintiff reported that her pain was aggravated by activity and relieved by rest. A physical examination of Plaintiff revealed tenderness to percussion of the radial tunnels, thumb weakness and tenderness to palpation of the lateral aspect of both elbows. Dr. Avioli prescribed non-steroidal anti-inflammatory medication and wrist splints. He also worked with Plaintiff on how to change the way she lifted with her hands. Dr. Avioli's assessment was that Plaintiff had extensor tendonitis of the forearms with possible mild radial tunnel syndrome.
6. On 30 April 2001, Plaintiff complained of increasing pain in both arms and palms. Plaintiff reported that she had tried to return to work, but her job duties made her symptoms worse. Dr. Avioli's impression at that time was bilateral forearm pain with the left worse than the right. Dr. Avioli continued medications and wrist splints and ordered physical therapy. He took Plaintiff out of work.
7. On 4 June 2001, Plaintiff reported that the physical therapy had helped a little, but she continued to experience bilateral pain in the front and back of her forearms, radiating from her wrist to her upper arms. Even though Plaintiff had been using her wrist splints, she continued to have trouble lifting things.
8. On 3 July 2001, Plaintiff had a positive Phalen's sign. Nerve conduction studies revealed early left carpal tunnel syndrome, early left ulnar entrapment or cubital tunnel syndrome. Plaintiff's right nerve conduction studies were normal. Plaintiff remained out of work.
9. On 11 July 2001, Plaintiff complained of bilateral forearm and hand pain, with the left worse than the right. Plaintiff reported that the wrist splints were not helping. Plaintiff was not responding to conservative treatment, so Dr. Avioli recommended surgical intervention. Plaintiff underwent a left carpal tunnel release and anterior transposition of the left ulnar nerve at the elbow on 26 July 2001. During the surgery, Dr. Avioli noted a moderate amount of tenosynovitis in the carpal canal. Plaintiff was discharged from the hospital on 12 July 2001. She remained out of work.
10. On 6 August 2001, Plaintiff's sutures and staples were removed. On 20 August 2001, Plaintiff reported that her left arm pain was much improved except for mild wrist tenderness and stiffness. Dr. Avioli ordered physical therapy for scar massage. On 29 August 2001, Plaintiff again complained of right arm pain. Dr. Avioli released Plaintiff to return to work in a light-duty capacity on 29 August 2001.
11. On 26 September 2001, Plaintiff reported that she had returned to work at light duty with Dr. Avioli's restrictions of no pushing, pulling or lifting greater than 5 to 10 pounds with the right arm and wearing a cock-up wrist splint and epicondylitis strap on the right arm. Plaintiff complained of pain while working. On 26 September 2001, Dr. Avioli placed Plaintiff on light duty with no pushing or pulling, no lifting over 5 to 10 pounds and no overhead lifting with either arm.
12. Plaintiff testified that she was laid off on 11 November 2001 due to an economic downturn. Her last day of working for Defendant-Employer was 11 November 2001. As of her last day at work, Plaintiff worked as a disassembler with approximately one hour spent working in the freezer.
13. Dr. Avioli treated Plaintiff for the last time on 15 May 2002. At that visit, Plaintiff complained of bilateral arm pain, with left shoulder and left palm pain. Plaintiff reported to Dr. Avioli that she no longer worked for Defendant-Employer because it did not honor her light-duty restrictions. Plaintiff reported that she was in school and that writing with her left hand caused hand cramps, but she did not experience the left forearm pain that she had before her surgery. Plaintiff continued to complain of pain in her right wrist, right forearm and right shoulder.
14. Dr. Avioli's final diagnoses were left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis, right radial tunnel syndrome and possibly bilateral volar wrist pain or fibromyalgia.
15. Dr. Avioli opined that Plaintiff's job was a significant contributing factor in the development of her left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis and right radial tunnel syndrome. In addition, he was of the opinion that Plaintiff's repetitive job duties with defendant-employer placed her at an increased risk of contracting or developing left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis and right radial tunnel syndrome over the general public not so employed.
16. Dr. Robert Bruce Wallace, a doctor of general medicine, saw Plaintiff once, on 12 November 2001. A physical examination of Plaintiff revealed generalized pain in the right forearm and right hand, a right positive Tinel's sign, left post-operative evidence of an ulnar release and carpal tunnel repair, discomfort in the left wrist and decreased left grip strength as compared to the right.
17. Dr. Wallace opined that Plaintiff's employment was an aggravating factor in her left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis and right radial tunnel syndrome. He did not give a clear answer as to Plaintiff's increased risk of developing left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis and right radial tunnel syndrome as compared to the general public not so employed.
18. Plaintiff has shown by the greater weight of the evidence that she contracted or developed an occupational disease through her employment with Defendant-Employer on or about 5 December 2000, resulting in left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis and right radial tunnel syndrome.
19. Plaintiff was out of work from 30 April 2001 until 29 August 2001 and 11 November 2001 and continuing. Plaintiff did not present any medical evidence that any doctor had taken her out of work as a result of her conditions subsequent to 11 November 2001. Plaintiff did not present any medical evidence that subsequent to 11 November 2001 she was unable to find work due to any disability which was caused by or related to her 5 December 2000 injuries.
20. Plaintiff has not been evaluated for or assigned any permanent partial impairment ratings.
21. Plaintiff is entitled to have defendants provide all medical treatment necessitated by her 5 December 2000 left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis and right radial tunnel syndrome, including the medical treatment by Dr. Emerson and Dr. Avioli.
22. Plaintiff's average weekly wage was $295.93, yielding a compensation rate of $197.39.
 ***********
Based upon the following foregoing stipulations and findings of fact the undersigned makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has shown by the greater of the evidence that she contracted or developed a compensable occupational disease through her employment with defendant-employer on or about 5 December 2000, resulting in left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis and right radial tunnel syndrome. N.C. Gen. Stat. § 97-53(13).
2. As a result of her compensable occupational diseases, Plaintiff was disabled from work for the period of 30 April 2001 through 29 August 2001. N.C. Gen. Stat. § 97-29.
3. Plaintiff has failed to prove by the greater weight of the medical and other evidence of record that her 5 December 2000 left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis, right radial tunnel syndrome resulted in any disability after 11 November 2001.
4. Plaintiff has not been evaluated for or assigned any permanent partial impairment rating. Plaintiff's entitlement to permanent partial disability benefits, if any, should be reserved for subsequent determination. N.C. Gen. Stat. § 97-2(9).
5. Plaintiff is entitled to have defendants provide all medical treatment necessitated by her 5 December 2000 left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis, right radial tunnel syndrome, including the medical treatment by Dr. Emerson and Dr. Avioli. N.C. Gen. Stat. §§ 97-2(19) 97-25.
6. Plaintiff's average weekly wage of $295.93 yields a compensation rate of $197.39 per week. N.C. Gen. Stat. § 97-2(5).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Subject to counsel fees hereinafter approved, Defendants shall pay to Plaintiff temporary total disability benefits in the weekly amount of $197.39 for the period of 30 April 2001 through 29 August 2001. This amount has accrued and shall be paid to Plaintiff in a lump sum.
2. Defendants shall pay all medical expenses incurred or to be incurred by Plaintiff as a result of her compensable left tenosynovitis, left carpal tunnel syndrome, left cubital tunnel syndrome, mild bilateral rotator cuff tendonitis and right radial tunnel syndrome when bills for same have been submitted to and approved by the Industrial Commission, for so long as such may reasonable be required to effect a cure, and give relief or lessen Plaintiff's period of disability.
3. Plaintiff's claim for workers' compensation benefits for disability after 11 November 2001 is DENIED.
4. The issue of whether Plaintiff is entitled to compensation for any permanent partial disability to her left hand or arms is RESERVED for subsequent determination.
5. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of the compensation awarded to Plaintiff herein. Defendants shall deduct 25% of the accrued compensation due Plaintiff and forward this amount directly to Plaintiff's counsel.
6. Defendants shall pay the costs.
This the ___ day of February 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN